# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

TRACY A. WILLIAMS, on behalf of herself and all others similarly situated,

        Plaintiff,

   vs.

BALLY'S MANAGEMENT GROUP, LLC

        Defendant.

**Civil Action No.: 1:25-00147-MSM-PAS**

## <u>PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS</u>

Oren Faircloth
Kimberly Dodson
745 Fifth Avenue, Suite 500
New York, New York 10151
Tel: (212) 532-1091
E: ofaircloth@sirillp.com
E: kdodson@sirillp.com

*Attorneys for Plaintiff and the Proposed Class*

## <u>TABLE OF CONTENTS</u>

I. INTRODUCTION ...................................................................................................1

II. BACKGROUND................................................................................................4

    A. STATUTORY FRAMEWORK: ERISA'S ANTI-DISCRIMINATION RULE ...........4

    B. REGULATORY REQUIREMENTS FOR WELLNESS PROGRAMS ......................6

    C. COMPLIANCE GAPS IN BALLY'S WELLNESS PROGRAM................................7

    D. MS. WILLIAMS ALLEGES DEFENDANTS VIOLATED ERISA'S ANTI-
       DISCRIMINATION PROVISIONS AND BREACHED THEIR FIDUCIARY
       DUTIES.................................................................................................10

III. ARGUMENT ...................................................................................................12

    A. LEGAL STANDARD.......................................................................................12

    B. MS. WILLIAMS HAS STANDING TO ASSERT FIDUCIARY BREACH
       AND PROHIBITED TRANSACTION CLAIMS UNDER 29 U.S.C. §§ 1109
       AND 1132(a)(2) ....................................................................................14

       1. Ms. Williams Is a Plan Participant and Properly Brings Claims on the Plan's
          Behalf ..............................................................................................14

       2. Section 1109 Liability Attached, Even Without Plan Losses, Because
          Fiduciary Profits Alone Are Actionable................................................15

       3. The Plan's Self-Funded Status Does Not Shield Bally's from Fiduciary
          Liability ...........................................................................................17

       4. Ms. Williams' Claims Are Redressable Because Restitution to the Plan
          Would Directly Benefit Participants ....................................................18

    C. MS. WILLIAMS ALLEGES A COGNIZABLE VIOLATION OF ERISA
       NOTICE REQUIREMENTS ...............................................................................20

    D. MS. WILLIAMS ALLEGES A COGNIZABLE VIOLATION OF THE
       "FULL REWARD" REQUIREMENT ...............................................................22

       1. Bally's Own Plan Materials Confirm the Violation ................................22

       2. Bally's Misstates the Law and the Burden .............................................23

i

3. The Statute, Regulations, and Case Law All Confirm That the "Full Reward" Must Be Retroactive ...................................................................................26

4. Loper Bright Does Not Authorize Courts to Disregard the Final Regulations or Rewrite the Wellness Program Framework ........................................................30

E. MS. WILLIAMS STATES A CLAIM FOR FIDUCIARY BREACH .......................31

1. Count II Challenges Fiduciary Conduct, Not Settlor Decisions .............................32

2. Ms. Williams Alleges a Prohibited Transaction Involving Plan Assets and Fiduciary Self-Dealing ..............................................................................34

3. Bally's Breached Its Duty to Monitor Plan Compliance .........................................36

F. EXHAUSTION OF ADMINISTRATIVE REMEDIES IS NOT REQUIRED FOR STATUTORY CLAIMS AND DOES NOT APPLY HERE ...........................37

IV. CONCLUSION ........................................................................................41

## I.    INTRODUCTION

Bally's Management Group, LLC ("Bally's") charges participants of its Welfare Benefit Plan (the "Plan") a $30 biweekly nicotine surcharge but does not provide the lawful means required to avoid it. Under ERISA's anti-discrimination provisions, § 702(b)(1), 29 U.S.C. § 1182(b)(1), group health plans may not charge higher premiums based on health status, such as nicotine use, unless the employer meets strict requirements for a compliant wellness program. Bally's does not meet those requirements. Plaintiff Tracy Williams was forced to pay, and continues to pay, the bi-weekly surcharge and was not offered a compliant wellness program or the proper disclosures. By imposing a health-based surcharge without offering a valid wellness program, Bally's cannot take advantage of ERISA's safe harbor allowing discriminatory surcharges, § 702(b)(2)(B).

Bally's does not dispute that Ms. Williams paid the surcharge or challenge her standing to contest the discriminatory fee she personally paid. Instead, Bally's mounts an attack on her standing to pursue Count II, the fiduciary breach claim under ERISA §§ 502(a)(2) and (a)(3), 29 U.S.C. §§ 1132(a)(2) and (a)(3). But Ms. Williams is a participant in the Plan challenging a systemic and discriminatory practice that harmed not only her, but hundreds of other Plan participants, as well as the Plan itself. She alleges Bally's, as Plan administrator, not only failed to communicate necessary disclosures to participants about their rights to avoid the surcharge and repeatedly failed, year after year, to review the terms of the wellness program to ensure its compliance with the law, but also that Bally's improperly used the unlawful surcharge proceeds to reduce its own contributions to the Plan and earn interest off money that should have been for the Plan and its participants. ERISA § 409(a), 29 U.S.C. § 1109(a), authorizes recovery not only for *losses* to the Plan, but also for *profits* earned through the improper use of plan assets to benefit a party in interest; here, Bally's itself.

1

Bally's insists that its self-funded structure shields it from scrutiny. But ERISA fiduciary duties apply regardless of funding method and Ms. Williams alleges that Bally's used participant-paid surcharges to reduce its own funding obligations, effectively substituting participant money for employer contributions. That is textbook fiduciary self-dealing. If Bally's wants to argue the Plan was not harmed, it can try to do so on the merits, but whether framed as a loss to the Plan or as fiduciary profit, it is actionable under § 409(a), 29 U.S.C. § 1109.

Bally's response to Ms. Williams' allegations that it failed to provide proper notice under Count I fares no better. Bally's does not deny that the Benefits Guides it conveyed to participants discussing the tobacco surcharge does ***not*** inform them that the "full reward" is available to all similarly situated individuals or that recommendations from their doctors will be accommodated, as required. Nor can it deny that these disclosures were absent from the Plan's Summary Plan Description ("SPD") until the language was recently updated in 2025. Instead, Bally's deflects by arguing, for instance, that a single paragraph in the recently updated 2025 SPD cures its longstanding failure to inform participants in other materials and prior years. But selectively quoting from an updated SPD while ignoring the glaring omissions from prior Plan materials does not explain why Bally's left these key protections out of the Benefits Guide it distributed in 2025. Bally's arguments ignore that ERISA's notice requirements apply to ***all*** communications discussing surcharges and the potential avenues participants have to avoid those surcharges. Omitting those disclosures from the documents participants are most likely to read, like the Benefits Guides, violates the rules governing wellness programs and prevents Bally's from taking advantage of the statutory exception.

Bally's follow up argument—that the Plan need not provide reimbursement at all—is likewise unpersuasive. First, Bally's insists that it does, in fact, provide the "full reward" through

retroactive reimbursement. But the facts known say otherwise. Multiple years of Benefit Guides told participants they could "eliminate" the surcharge only "upon completion" of the program, language that signals *prospective* relief only, instead of full retroactive reimbursement as required. Next, Bally's allots several pages of its motion arguing that employers are not required to offer retroactive reimbursement. But the statute refers to the "***full*** reward," and the legislative context, regulatory guidance, and positions taken by the Department of Labor ("DOL") make clear that the "full reward" means the surcharges for the entire Plan year. This is not a case of threadbare allegations or speculative harm, as Bally's suggests; Ms. Williams' allegations are backed by Bally's own materials.

Every court to date that has encountered this issue has found that failing to make available the "full reward" under an outcome-based wellness program is sufficient ground to state a claim for relief, including two earlier this year. *See Bokma v. Performance Food Grp., Inc.*, No. 3:24-cv-686, 2025 U.S. Dist. LEXIS 99234 (E.D. Va. May 20, 2025) and *Mehlberg v. Compass Grp. USA, Inc*., No. 24-cv-04179, 2025 U.S. Dist. LEXIS 84589 (W.D. Mo. Apr. 15, 2025). Bally's attempt to sidestep its failure to provide the full reward by pointing to recently updated language in a 2025 SPD stating that "prior surcharge amounts . . . will be refunded" says nothing about how the program was administered in prior years and its failure to include that same updated language in the 2025 Benefit Guide speaks volumes about its noncompliance with the regulatory framework. Further, Bally's argument that *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024) invalidated the wellness program regulations, a reading that would effectively grant plan sponsors *carte blanche* to disregard binding legal requirements, misses the mark. Here, there is no colorable argument of ambiguous statutory language (invoking *Loper Bright*); rather, this case concerns whether the rules governing wellness program, which are *substantive* regulations formed over the

course of two decades with multiple notice-and-comment processes, require employers to meet strict criteria if they decide to impose a discriminatory surcharge on participants

   This is a straightforward case. Bally's charged Plan participants more based on a health factor without providing the lawful off-ramps it was supposed to. That is discrimination, plain and simple. Bally's wellness program fails the regulatory test, its documents confirm the deficiencies, and its justifications for its violations are out of step with the statute, the governing regulations, agency guidance, and the growing body of case law denying motions to dismiss in nearly identical ERISA challenges. For these reasons and for those more fully detailed below, the motion to dismiss should be denied in its entirety.

## II.     BACKGROUND

### A. Statutory Framework: ERISA's Anti-Discrimination Rule

   ERISA contains a clear prohibition: group health plans may not charge higher premiums to similarly situated individuals based on a health factor, such as tobacco use. *See* 29 U.S.C. § 1182(b)(1); 42 U.S.C. § 300gg-4(b)(1).[1] Specifically, ERISA states, in relevant part:

> A group health plan . . . may not require any individual (as a condition of enrollment or continued enrollment under the plan) to pay a premium or contribution which is greater than such premium or contribution for a

---

[1] Section 300gg-4 was added to ERISA through incorporation with the passing of the Affordable Care Act and the Public Health Service Act ("PHSA"). *See Incentives for Nondiscriminatory Wellness Programs in Group Health Plans*, 78 Fed. Reg. 33158–170 (June 3, 2013) (hereinafter the "**Final Regulations**"); *see also* 29 C.F.R. § 2590.702(f) and 45 C.F.R. § 146.121(f) (implementing regulations for §§ 1182 and 300gg-4, respectively). Together, these statutes (ERISA and the PHSA) regulate the administration of group health plans and the use of outcome-based wellness programs, like the one Bally's imposes, in connection with premium differentials. As discussed further below, when an employer adopts a wellness program that imposes a surcharge unless a health outcome is met (e.g., being tobacco-free), the law requires that the program meet strict nondiscrimination rules, including the availability of a reasonable alternative standard, the provision of the "full reward" to those who qualify, and the required notice to participants.

similarly situated individual enrolled in the plan on the basis of any health status-related factor . . . .

There is only one narrow exception. Congress carved out a statutory safe harbor allowing plans to provide "premium discounts or rebates"—positive incentives—in exchange for participation in wellness programs that promote health and prevent disease. *See* §§ 1182(b)(2)(B) and 300gg-4(b)(2)(B). Those provisions state:

> Nothing in paragraph (1) shall be construed . . . to prevent a group health plan . . . from establishing ***premium discounts*** or ***rebates*** or ***modifying otherwise applicable copayments or deductibles*** in return for adherence to ***programs of health promotion and disease prevention***."

29 U.S.C. § 1182(b)(2)(B) (emphases added). But this safe harbor is limited. It permits discounts or rebates, not penalties. The difference is not semantic: discounts reward improvement or participation while surcharges penalize individuals for a health condition. Without full compliance with the Final Regulations, any surcharge imposed based on a health factor, such as tobacco use, is presumptively unlawful.

Importantly, the statutory provisions governing wellness programs are implemented and clarified through a dual regulatory framework. The DOL issues implementing regulations for ERISA plans at 29 C.F.R. § 2590.702(f), while the Department of Health and Human Services ("HHS") issues substantively identical regulations for group health plans governed by the PHSA at 45 C.F.R. § 146.121(f). These regulations are jointly developed and enforced by the DOL, HHS, and the Department of Treasury (collectively, the "Departments"). *See* Final Regulations, 33159. In short, ERISA establishes a firm default rule against premium differentials based on health status, and permits deviation from that rule ***only*** when an employer satisfies each of the strict, regulatory conditions for a compliant wellness program; anything less falls outside the statutory safe harbor and renders the surcharge unlawful.

5

### B. Regulatory Requirements for Wellness Programs

Recognizing the risk that wellness programs could be used as backdoor mechanisms for cost-shifting or health-based discrimination, Congress directed the Departments to establish clear, enforceable rules to govern such programs.[2] Pursuant to that directive, the Departments issued binding regulations, effective since 2014, that define the conditions under which an outcome-based wellness program may lawfully vary premiums (i.e., the Final Regulations).[3]

The regulatory criteria serve a critical function: they set strict guardrails to prevent employers from using so-called "wellness programs" as backdoor cost-shifting mechanisms. As the Departments made clear, these criteria "***must be satisfied*** in order for the plan or issuer to ***qualify for an exception*** to the prohibition on discrimination based on health status." Final Regulations, 33160 (emphases added). A plan that fails to comply with even one of the five regulatory criteria cannot lawfully impose a premium differential based on a health factor like tobacco use. In that case, the program does not fall within the statutory safe harbor and the surcharge is presumptively unlawful under ERISA and the PHSA. *See* Final Regulations, 33160

---

[2] *See* 29 U.S.C. § 1191c (authorizing the Secretary of Labor to "promulgate such regulations as may be necessary or appropriate to carry out the provisions of this part."); 29 U.S.C. § 1135 ("the Secretary may prescribe such regulations as he finds necessary or appropriate to carry out the provisions of this subchapter.").

[3] Conspicuously absent from Bally's "Statutory and Regulatory Background" section (Def. Br., 3–8) is any mention of the regulations that govern wellness programs under the PHSA § 2705: 45 C.F.R. § 146.121(f). While Bally's repeatedly cites § 2705, 42 U.S.C. § 300gg-4, as well as the parallel regulations at 29 C.F.R. § 2590.702(f), it does not mention or cite the controlling PHSA regulations. This omission gives the inaccurate impression that the wellness program rules adopted under the PHSA no longer apply or can be safely ignored. It is as if Bally's believes that it can render these regulations unenforceable by sheer silence. Perhaps Bally's believes that after *Loper Bright*, courts are free to disregard substantive, binding regulations. *See* Def. Br., 26. But that is not the law. Unless and until 45 C.F.R. § 146.121(f)(4) is repealed or invalidated through proper legal channels, it remains in full force and must be applied. Compliance with these regulations is not optional; it is the foundation of any lawful wellness program.

6

(explaining "these rules set forth criteria for an ***affirmative defense*** that can be used by plans and issuers in response to a claim that the plan or issuer discriminated") (emphasis added); *see also* 29 C.F.R. § 146.121(f)(4) (stating that a "health-contingent wellness program . . . does not violate the provisions of this section **only if <u>all</u> of the following requirements are satisfied**" (emphasis added)).

The five regulatory requirements applicable to outcome-based wellness programs—such as programs contingent on tobacco use—are:

1. **Frequency of Opportunity to Qualify** – Participants must be given at least one opportunity per year to qualify for the reward. 45 C.F.R. § 146.121(f)(4)(i).

2. **Size of Reward** – The total value of any reward or penalty must not exceed 50% of the cost of employee-only coverage. 45 C.F.R. § 146.121(f)(4)(ii).

3. **Reasonable Design** – The program must be reasonably designed to promote health or prevent disease, and not serve as a "subterfuge for discrimination based on a health factor." To meet this requirement, a reasonable alternative standard must be provided to any individual who does not meet the initial outcome. 45 C.F.R. § 146.121(f)(4)(iii).

4. **Uniform Availability and Full Reward** – The full reward must be available to all similarly situated individuals who satisfy the alternative standard. 45 C.F.R. § 146.121(f)(4)(iv).

5. **Notice Requirement** – "[A]ll plan materials describing the" tobacco premium differential must clearly inform participants of a reasonable alternative standard and must include a statement that a participant's physician's recommendations will be accommodated. 45 C.F.R. § 146.121(f)(4)(v).

## C. Compliance Gaps in Bally's Wellness Program

Bally's so-called "wellness program" fails to meet the basic regulatory requirements that would allow it to lawfully impose a tobacco surcharge. Its disclosures are either missing, misleading, or buried, and none of its materials consistently or clearly communicate participants' rights.

Start with the 2022 SPD. *See* Def. Ex. 1, Plan SPD (2022), Doc 11-1. Bally's cites it as a key Plan document in support of its motion,[4] yet it makes no mention of the tobacco surcharge, no reference to the required "full reward," no explanation of what qualifies as a reasonable alternative standard, and no usable contact information. This is not a mere technical oversight because "[f]or ERISA plans, wellness program terms (including the availability of any reasonable alternative standard) are generally required to be disclosed in the" SPD. *See* FAC, ¶ 30 (citing Final Regulations, 33166). The 2022 SPD does include a boilerplate disclosure—buried in dense formatting on page 13 of an eighty-page document—stating that participants "might qualify" for a different means of earning a reward and should "contact the contact person at your worksite as described in Schedule F." Further, that language does not even appear in the documents participants relied on when enrolling.[5] Clearly, Bally's was aware of the necessary disclosures for

---

[4] Ms. Williams does not object to the Court's consideration of the documents submitted by Bally's in connection with its current motion to dismiss (i.e, Docs 11-1 through 11-5) because at least some of these materials are referenced in the First Amended Complaint ("FAC"). *See* FAC, Doc. 10, ¶¶ 8, 40, 44. The documents may properly be considered without converting the motion into one for summary judgment. *See In re Textron, Inc. ERISA Litig.*, No. 09-cv-00383, 2011 U.S. Dist. LEXIS 100209, at *6–7 n.1 (D.R.I. Sep. 6, 2011) (considering plan and SPD documents referenced in the complaint where authenticity was not disputed). However, if the Court considers the documents attached to Bally's current motion to dismiss, it should also consider the documents attached to Bally's prior motion to dismiss (i.e., Docs. 9-1 through 9-5) as these documents are directly referenced In the FAC and support, rather than refute, Ms. Williams' claims. These documents confirm that it imposed a discriminatory surcharge without offering without offering a compliant wellness program, failed to provide the "full reward" required by 45 C.F.R. § 146.121(f)(4)(iv), and omitted key disclosures regarding physician accommodation under § 146.121(f)(4)(v). Should any factual refinements be warranted in light of these materials, Ms. Williams respectfully requests leave to amend the FAC accordingly. However, because these documents corroborate key compliance failures, the substance of Ms. Williams' claims and legal theory would remain unchanged.

[5] *See* 45 C.F.R. § 146.121(f)(4)(v); *see* Final Regulations, 33166 ("These final regulations … require plans and issuers to disclose the availability of a reasonable alternative standard to qualify for the reward … ***in all plan materials*** describing the terms of a health-contingent wellness program (both activity-only and outcome-based wellness programs) …. include[ing] contact

"Wellness Programs" in general but it chose not to include that information in the 2023 or 2024 Benefit Guides.[6]

Even the 2025 Benefits Guide (Def. Ex. 5, Doc. 11-5)—the most recently updated version—still fails to tell participants that satisfying the alternative standard entitles them to a full refund of surcharges already paid. In 2025, after lawsuits like this one began surfacing across the country, Bally's suddenly updated its SPD to include the missing language. The new language refers to full rewards and mentions that physicians' recommendations would be accommodated (*see* Def. Ex., Doc. 11-2, PageID 468), but Bally's conspicuously left that language out of the 2025 Benefits Guide. *See* PageID 368 (discussing the "Tobacco Surcharge" and making no mention of the "full reward" or that participants' physicians' recommendations would be accommodated). The Benefit Guide is the document employees actually use when selecting coverage, and Bally's knew how to include the right language in the 2025 version because it just updated that language in the 2025 SPD, but it chose not to do the same in the Benefit Guide.

None of Bally's Benefits Guides explain that participants who complete the reasonable alternative standard will receive the *full* reward or that participants' physicians' recommendations would be accommodated, as expressly required by law. Instead, the language in the 2023 and 2024

---

information for obtaining the alternative and a statement that recommendations of an individual's personal physician will be accommodated. For outcome based-wellness programs, this notice must also be included in any disclosure that an individual did not satisfy an initial outcome-based standard…. ***a plan disclosure that references a premium differential based on tobacco use***, or based on the results of a biometric exam, ***is a disclosure describing the terms of a health-contingent wellness program and, therefore, must include this disclosure***.").

[6] Bally's did not attach the 2023 or 2024 Benefits Guides to its current motion to dismiss. However, those documents—previously filed at Doc. 9-4 (PageID 250) and Doc. 9-5 (PageID 278)—do not inform participants that they are entitled to retroactive reimbursement upon meeting a reasonable alternative standard, nor do they mention that participants' treating physicians may provide recommendations that the plan is obligated to accommodate. *See* FAC, ¶¶ 32–34; Def. Ex. 4 and 5, Docs. 9-4 (PageID 250) and 9-5 (PageID 278); 45 C.F.R. § 146.121(f)(4)(v).

version of the Benefits Guides implies that the tobacco surcharge will simply be removed going forward (*"upon completion"* of the Quit for Life program). *See* FAC, ¶¶ 32–34; Def. Ex. 4 and 5, Docs. 9-4 (PageID 250) and 9-5 (PageID 278). That phrasing signals that the reward is applied on a *prospective-only* basis, with no mention of retroactive reimbursement for surcharges already paid. While Bally's states that it "provides retroactive reimbursements of the surcharge," (Def. Br., 24),[7] it spends five pages of its motion rejecting any obligation to provide retroactive reimbursement (*see* Def. Br., 22–28), suggesting it may still employ a prospective-only approach.

The documents Bally's relies on confirm that its tobacco cessation program is not a "program[] of health promotion" but a discriminatory surcharge masquerading as a wellness program. A lawful wellness program cannot impose a discriminatory penalty and then hide or obscure the participant's right to avoid it. Bally's tobacco surcharge operates as a health-based penalty because it does not offer a legally-compliant off-ramp or provide the necessary disclosures, making the surcharge the exact kind of subterfuge the Final Regulations were designed to prevent.

### D. Ms. Williams Alleges Defendants Violated ERISA's Anti-Discrimination Provisions and Breached Their Fiduciary Duties

Plaintiff Tracy Williams is a participant in the Bally's Plan and has paid a monthly tobacco surcharge, which is required to maintain her health coverage. *See* FAC. ¶ 10. Ms. Williams alleges

---

[7] To be clear, the only document in the record that references a "full reward" is the latest 2025 version of the SPD that was updated to include such language. *See* Def. Ex. 2, Doc 11-2, PageID 456. This merely confirms the likelihood that Bally's did not have a compliant policy in place prior to 2025. While there are many fact issues related to whether participants saw the new language in the 2025 SPD, the inclusion of this new language does not retroactively cure the disclosure deficiencies in earlier years. Whether the 2025 SPD reflects a policy change or simply clarifies a longstanding practice is a disputed factual issue that should not be resolved at the pleading stage. And, even if Bally's were correct that the full reward is now available going forward, that has no bearing on Plaintiff's claims arising from prior years in which she and others were denied retroactive reimbursement and provided with noncompliant disclosures.

that Bally's tobacco surcharge violates ERISA because it is a discriminatory surcharge imposed without providing a compliant wellness program necessary for Bally's to qualify for the statutory safe harbor. *Id.*, ¶¶ 6–7, 57–58.

Specifically, Bally's program is not "reasonably designed to promote health or prevent disease," and instead operates as an impermissible cost-shifting scheme. *Id.*, ¶¶ 6–7, 63–70. Bally's fails to provide the "full reward" required by regulation to participants who complete a reasonable alternative standard. *Id.*, ¶¶ 56–57. This deficiency violates the full reward requirement that must be made available to all similarly situated participants. *Id.*, ¶¶ 31–34; *see also* 45 C.F.R. § 146.121(f)(4)(iv).

In addition, Bally's failed to provide participants with the regulatory disclosures required to make the program accessible and legally compliant. *See id.*, ¶¶ 35–39. Bally's failed to include a statement that a participant's physician's recommendations would be accommodated, as required under 45 C.F.R. § 146.121(f)(4)(v). *Id.* This disclosure, along with reference to the tobacco surcharge and wellness program, are absent from the SPD (except 2025) and other plan materials where such information is required to appear. *Id.* ¶¶ 37–38. These gaps, Ms. Williams alleges, further prevent the program from qualifying for the safe harbor and frustrate the nondiscrimination purpose of the wellness regulations. *Id.* ¶¶ 39, 56.

Bally's exercised discretionary authority over not only the administration of the tobacco surcharge and wellness program but also the communications sent to participants regarding those programs. *See* FAC, ¶¶ 64–65. Bally's actively administered the Plan and, as Plan administrator, determined the content of the Benefits Guidebooks and other Plan-related materials that described the surcharge and available wellness options. *Id.*, ¶ 65. Bally's failed to include required disclosures in those communications, such as information regarding the availability of the full

11

reward, the availability of a *reasonable* alternative standard, or the obligation to accommodate participants' physicians' recommendations. *Id*. ¶¶ 35–38, 65. Ms. Williams also alleges that Bally's failed to adequately review the terms of the Plan and the associated wellness program materials to ensure compliance with ERISA and its implementing regulations. Id. ¶¶ 64, 70–71.

In addition to controlling the structure and communications of the program, Bally's withheld tobacco surcharge amounts directly from participants' paychecks and deposited those funds into its general corporate accounts. *Id*., ¶¶ 40–41. According to Ms. Williams, the surcharge funds were not used to offset participant premiums or enhance benefits but were instead retained by Bally's and used to reduce the company's own contributions to the Plan. *Id*., ¶¶ 41–42, 67. Bally's earned interest on these improperly retained funds, which otherwise would have been contributed to the Plan. *Id*., ¶¶ 69–70. In short, Bally's misused plan assets for its own financial benefit and engaged in prohibited self-dealing transactions under ERISA. *Id*. ¶¶ 68–70.

 As a result of these alleged practices, Ms. Williams contends that she and other similarly situated participants suffered financial harm by paying unlawful tobacco surcharges, while the Plan was deprived of employer contributions that would have otherwise been required had Bally's not offset its obligations using participant-paid funds. *See* FAC ¶¶ 41–42, 67, 72. Ms. Williams seeks equitable relief on behalf of herself and the Plan under ERISA §§ 502(a)(2) and 502(a)(3), including restitution, disgorgement, surcharge, declaratory and injunctive relief, and a constructive trust over improperly retained surcharge funds. *Id*., ¶¶ 60, 73; Prayer for Relief, 26, ¶¶ C–J.

### III.    ARGUMENT

#### A.  Legal Standard

Defendant moves to dismiss under Rule 12(b)(1), claiming Ms. Williams lacks Article III and statutory standing and, therefore, the court lacks subject matter jurisdiction. Bally's also

asserts that Ms. Williams has failed to state a claim under Rule 12(b)(6). Defendant is wrong on both counts.

In reviewing a Rule 12(b)(1) motion, courts distinguish between a "factual challenge" and a "sufficiency" challenge to subject matter jurisdiction. *Valentin v. Hosp. Bella Vista*, 254 F.3d 358, 363 (1st Cir. 2001). In a factual challenge, there is a "differential factfinding," the parties can proffer evidence outside the pleadings, and no presumptive truthfulness attaches to the plaintiff's allegations. *Id*. However, where the challenge is sufficiency, as it is here, the court "must credit the plaintiff's well-pleaded factual allegations (usually taken from the complaint, but sometimes augmented by an explanatory affidavit or other repository of uncontested facts), draw all reasonable inferences from them in her favor[,]" and rule accordingly. *Id.* In other words, in a "sufficiency" challenge the Court should use the same standard as a Rule 12(b)(6) challenge. *Cebollero-Bertran v. P.R. Aqueduct & Sewer Auth.*, 4 F.4th 63, 69 (1st Cir. 2021) ("The analysis is essentially the same as a Rule 12(b)(6) analysis: we accept the well-pleaded facts alleged in the complaint as true and ask whether the plaintiff has stated a plausible claim that the court has subject matter jurisdiction.").

In the context of a Rule 12(b)(6) motion, courts must accept all well-pleaded factual allegations as true and draw all reasonable inferences in the plaintiff's favor, resolving any ambiguities in the light most favorable to the non-moving party. *United States ex rel. Hutcheson v. Blackstone Med., Inc*., 647 F.3d 377, 383 (1st Cir. 2011). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Ms. Williams need not demonstrate that her claims are probable, only that they are more than just possible. *Id.*

### B.  Ms. Williams Has Standing to Assert Fiduciary Breach and Prohibited Transaction Claims Under 29 U.S.C. §§ 1109 and 1132(a)(2)

#### 1.  Ms. Williams Is a Plan Participant and Properly Brings Claims on the Plan's Behalf

Bally's standing argument begins on the wrong foot. As a current participant in the Plan, Ms. Williams has the right to assert claims under ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), which expressly authorizes *participants* to seek relief on behalf of the Plan for breaches of fiduciary duty under 29 U.S.C. § 1109. *See LaRue v. DeWolff, Boeberg & Assoc., Inc.*, 552 U.S. 248, 256 (2008) (§ 502(a)(2) "authorize[s] recovery for fiduciary breaches that impair the value of plan assets in a participant's individual account.").[8] The statute permits participants to step into the shoes of the Plan and pursue claims for misconduct that depleted Plan assets, diverted Plan resources, or financially benefited the fiduciary at the Plan's expense. *N.R. v. Raytheon Co.*, 24 F.4th 740, 750 (1st Cir. 2022) ("the Supreme Court has characterized 29 U.S.C. § 1109(a) as 'primarily concerned with the possible misuse of plan assets, and with remedies that would protect the entire plan,'" (citing *Mass. Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 142 (1985))).

That is precisely what Ms. Williams alleges here. She asserts that Bally's used participant-paid tobacco surcharges to offset its own funding obligations to the Plan. FAC, ¶¶ 66–70. Rather than fund its share of the Plan's liabilities, Bally's rerouted participant contributions for its own benefit, shifting the financial burden from employer to employees. Each time Bally's deducted

---

[8] Bally's argument mistakenly suggests that a plaintiff must choose between seeking individual relief or asserting harm to the plan as a whole under ERISA § 502(a)(2). But the *LaRue* Court made clear that these are not mutually exclusive categories holding that "although § 502(a)(2) does not provide a remedy for individual injuries distinct from plan injuries, that provision does authorize recovery for fiduciary breaches that impair the value of plan assets in a participant's individual account." *Id.*, 256. That is, nothing in *LaRue* prevents a participant from seeking to recover for losses to his or her individual account, so long as the recovery is on behalf of the plan. In fact, *LaRue* recognizes that those categories can be, and often are, directly related.

money from Ms. Williams' paycheck, those funds became Plan assets pursuant to 29 C.F.R. § 2510.3-102.[9] But instead of safeguarding those contributions, Bally's deposited them into its own corporate accounts, where it earned interest, without passing the value back to the Plan or its participants. *See* FAC, ¶ 66–70. This is not a hypothetical harm. If Bally's had not used participant-paid surcharges to reduce its own contributions, the Plan would have had more assets. That is enough to establish standing. *See Tiara Yachts, Inc. v. Blue Cross Blue Shield,* 138 F.4th 457 (6th Cir. 2025) ("ERISA treats self-dealing transactions as 'presumptively unlawful,'" (citing *Appvion, Inc. Ret. Sav. & Emp. Stock Ownership Plan ex rel. Lyon v. Buth*, 99 F.4th 928, 948 (7th Cir. 2024)).

Even if a direct economic loss were required to sustain a fiduciary breach claim under § 1109 (it is not), Ms. Williams has alleged one. She describes a scheme that extracted unlawful surcharges, failed to notify participants of valid off-ramps to avoid the surcharges, neglected to review the terms of the wellness program to ensure compliance, and funneled participant funds, including funds from Ms. Williams, into Bally's own coffers. Administering the surcharge in this way distorted the Plan's cost-sharing formula and undermined its financial health. Nothing more is needed to establish constitutional or statutory standing at the pleading stage.

### 2. Section 1109 Liability Attached, Even Without Plan Losses, Because Fiduciary Profits Alone Are Actionable

Bally's mischaracterizes ERISA's fiduciary breach framework. Contrary to its assertion (Def. Br., 15–16), § 1109(a) does not require a plaintiff to show a traditional "loss to the plan" in order to state a claim. Section 1109(a) creates two distinct and independent grounds for fiduciary

---

[9] 29 C.F.R. § 2510.3-102(a)(1) provides, in relevant part: For purposes of … title I of ERISA … the assets of the plan include amounts … that a participant or beneficiary pays to an employer, or ***amounts that a participant has withheld from his wages by an employer***." (Emphasis added.)

liability: (1) restoration of "any losses to the plan" and (2) disgorgement of "any profits of such fiduciary which have been made through use of assets of the plan." 29 U.S.C. § 1109(a). Either prong is sufficient on its own. The law is well-settled on this point. A fiduciary's obligation under ERISA is not limited to avoiding losses, it also includes an affirmative duty to avoid personal enrichment through misuse of plan assets. *See Donovan v. Bierwirth*, 754 F.2d 1049, 1052 n.3 (2d Cir. 1985) (recognizing that "there can be a breach of duty without any 'loss' to a plan"); *see also Harris Tr. & Sav. Bank v. Salomon Smith Barney, Inc.*, 530 U.S. 238, 250 (2000) (holding that ERISA authorizes trust-law equitable remedies of restitution and disgorgement of profits, regardless of whether a loss has occurred). That principle applies squarely here.

Ms. Williams alleges that Bally's deducted unlawful surcharges without offering a compliant wellness program and used these participant-paid tobacco surcharges as a substitute for its own contributions to the Plan. *See* FAC, ¶ 67. This allowed Bally's to reduce its funding obligation while retaining the financial benefit of those participant-paid amounts. This financial gain, derived from administration of Plan assets, constitutes a fiduciary profit. *See Leigh v. Engle*, 727 F.2d 113, 137 (7th Cir. 1984) ("Section 1109 permits recovery of a fiduciary's profits [] where there is a causal connection between the use of the plan assets and the profits made by fiduciaries on the investment of their own assets."); *Edmonson v. Lincoln Nat'l Life Ins. Co.*, 725 F.3d 406, 415 (3d Cir. 2013) ("ERISA's duty of loyalty bars a fiduciary from profiting ***even if no loss to the plan occurs***." (emphasis added)). A fiduciary cannot use its position to derive financial advantage from plan administration, which is exactly what Ms. Williams alleges here. That kind of conflicted behavior (i.e., where the fiduciary uses plan assets as a tool for self-enrichment), is precisely what the "profits" clause of § 1109 was enacted to address.  Considering these factors, liability under Section 1109 attaches regardless of whether the Plan suffered a loss, because the statute

independently prohibits fiduciaries from retaining profits derived from the use or administration of plan assets.

### 3. The Plan's Self-Funded Status Does Not Shield Bally's from Fiduciary Liability

Bally's mistakenly argues that it is insulated from fiduciary breach claims because the Plan is "self-funded" and the Plan resembles a defined benefit structure. Def. Br., 16–17. But ERISA does not exempt fiduciaries based on how a plan is funded. Whether a plan is self-funded, fully insured, or something in between, ERISA's fiduciary duties apply to any party that exercises discretionary authority over plan management, administration, or assets. *See* 29 U.S.C. § 1002(21)(A).[10] The Plan is still a legal entity with fiduciary protections. As such, function, not form, governs fiduciary status. *See Varity Corp. v. Howe*, 516 U.S. 489, 527 (1996) ("Congress defined 'fiduciary' not in terms of formal trusteeship, but in *functional* terms of control and authority over the plan." (citation omitted)).

The Plan here is an ERISA-covered benefit plan. Its self-funded structure does not erase the fiduciary obligations of those who administer it. Bally's cannot avoid liability simply because it pays claims out of general assets rather than through a separate trust. ERISA imposes fiduciary standards to prevent employers from blurring the line between plan administration and corporate self-interest. When an employer like Bally's uses its discretionary authority to impose a surcharge on participants, then applies that surcharge to offset its own funding obligations, it is not acting as

---

[10] *See Su v. BCBSM, Inc*., No. 24-cv-99, 2024 U.S. Dist. LEXIS 150274, at *15 (D. Minn. Aug. 22, 2024) (finding that in a case involving a self-funded plan, "[t]rust law confirms that an encumbrance, not just direct spending, is significant for fiduciary purposes. . . . . Whenever [the defendant] pays a claim, plan funds are automatically encumbered . . . . [the plaintiff] has thus plausibly alleged that BCBSM exercises authority over plan funds when it decides to pay a claim and owes the plans corresponding duties as a functional fiduciary.").

a neutral administrator. It is making a fiduciary decision that directly benefits itself at the expense of Plan participants. Bally's cannot have it both ways. It cannot design and administer a cost-shifting program that benefits itself financially and then disavow the responsibilities that come with controlling Plan assets. ERISA does not grant fiduciaries a pass based on how they structured the plan's finances. The statute imposes duties to act solely in the interest of participants, and those duties apply here, regardless of how the Plan is funded.

### 4. Ms. Williams' Claims Are Redressable Because Restitution to the Plan Would Directly Benefit Participants

Bally's suggests that even if Ms. Williams prevails, any judgment ordering it to reimburse the Plan or disgorge profits would be meaningless because Bally's could simply offset that liability by reducing future contributions. Def. Br., 18–19. But that is not how redressability works. The relevant question is whether the Court can issue binding relief that would likely address the injury, not whether the defendant might attempt to neutralize that relief later. *See Emergency Physician Servs. of N.Y. v. UnitedHealth Grp., Inc.*, 749 F. Supp. 3d 456, 476–77 (S.D.N.Y. 2024) (rejecting a similar redressability challenge where the plaintiffs transferred litigation proceeds to a subsidiary, holding that redressability does not turn on how plaintiffs intend to use recovered funds, but rather on whether a court can grant binding relief).

Redressability is satisfied where a judgment would create a "significant increase in the likelihood" that the plaintiff obtains relief for the injury suffered. *Utah v. Evans*, 536 U.S. 452, 464 (2002). The analysis turns on the legal consequence of a judgment, not on whether the defendant may try to manipulate its aftermath. Courts routinely reject redressability challenges that hinge on speculative post-judgment behavior. *Juliana v. United States*, 217 F. Supp. 3d 1224, 1247 (D. Or. 2016) ("A plaintiff need not show a favorable decision is certain to redress his injury, but must show a substantial likelihood it will do so."); *N. N.M. Stockman's Ass'n v. United States*

18

*Fish & Wildlife Serv.*, 494 F. Supp. 3d 850, 954 (D.N.M. 2020) ("Where the plaintiff has established that the challenged action causes him or her an ongoing injury in fact, then an order invalidating and enjoining further engagement in the challenged action will redress the injury.")

Here, a judgment in Ms. Williams' favor would require Bally's to restore misused Plan assets or surrender profits derived from fiduciary misconduct. That relief would have concrete effects: it would increase the Plan's assets, reinforce fiduciary accountability, and help correct the cost-shifting structure that harmed Plan participants. Whether Bally's later adjusts its funding approach is beside the point. Def. Br., 18–19.[11] Article III does not require perfect enforcement. It requires a court-ordered remedy with real-world legal consequences, and this case easily clears that bar. *See La Liga de Ciudades de P.R. v. Fin. Oversight & Mgmt. Bd. for P.R. (In re Fin. Oversight & Mgmt. Bd. for P.R.),* 110 F.4th 295, 319 (1st Cir. 2024) ("redress need not be certain . . . . the plaintiff 'need not demonstrate that its entire injury will be redressed by a favorable judgment, [but] it must show that the court can fashion a remedy that will at least lessen its injury.'" (citations omitted)).

At this stage, Ms. Williams has done more than enough. She alleges that Bally's not only failed to notify participants of their rights under the Plan and failed to review the terms of the wellness program to ensure compliance with ERISA, but also that Bally's used participant-paid surcharges collected under a noncompliant program to reduce its own Plan contributions and profit

---

[11] Bally's suggestion that it might simply offset any reimbursement by reducing its future Plan contributions is problematic. Def. Br., 19. Indeed, Bally's argument tacitly concedes that the surcharge was motivated by cost-saving interests, reinforcing Plaintiff's theory that fiduciary self-dealing occurred and that restoration of funds would yield a meaningful remedy. If Bally's were to respond to judicial relief by adjusting its funding practices in a way that harms participants, such conduct may itself be a distinct ERISA violation. *See Walsh v. Sweet Lemon, Inc.*, No. 20-cv-12217, 2022 U.S. Dist. LEXIS 868, at *5 (D. Mass. Jan. 4, 2022) (finding that the defendant retaliating against its employees was liable for punitive damages).

19

at participants' expense. A judgment requiring Bally's to repay those amounts would directly redress the harm. Bally's speculation about future contribution strategy is not a defense, it is a distraction.

### C. Ms. Williams Alleges a Cognizable Violation of ERISA Notice Requirements

Bally's argument that Ms. Williams has "plead[ed] herself out of court" (Def. Br., 21) relies on an overly generous reading of its own deficient disclosures and a misapplication of ERISA's notice rules. Under the Final Regulations, plan sponsors must disclose—across *all* plan materials that describe an outcome-based wellness program—(1) the availability of a reasonable alternative standard and (2) a clear statement that participants' personal physicians' recommendations will be accommodated. *See* 29 C.F.R. § 2590.702(f)(4)(v); 45 C.F.R. § 146.121(f)(4)(v). These disclosures are mandatory and must be clearly communicated in any document that references the tobacco surcharge or related reward.

Ms. Williams alleges that Bally's repeatedly failed to meet this standard. While Bally's points to boilerplate language in its 2022 SPD,[12] that language does not reference the tobacco surcharge, does not inform participants of a retroactive refund, and appears in generic terms that do not explain how the program works or what rights participants have. Worse still, Bally's concedes it omitted these disclosures from its Benefits Guides, the very materials participants use to make coverage decisions during open enrollment. These omissions deprived participants of the

---

[12] Bally's points to page 13 of the 2022 version of the SPD (Def. Br., 20 citing Ex. 1 at 13), which contains a statement that participants' physicians' recommendations will be accommodated. But that version makes no mention whatsoever of the tobacco surcharge, much less how to avoid it. Such a vague, catch-all statement regarding "wellness programs" in general does not satisfy ERISA's requirement for clear disclosure. *See Merriam-Webster* Definition of "Disclosure" ("To make known or public"; "to expose to view"). Far from "disclosing" that there was a way to avoid the surcharge, the 2022 SPD effectively buried it.

essential information they needed to exercise their rights under the law. Bally's does not argue that **all** its plan materials discussing the surcharge include the requisite disclosures, or even that the one it attached fully satisfies them.

Even in 2025, when Bally's revised its SPD to include language it believes is more defensible, it still failed to update the corresponding Benefits Guide. *See* Def. Ex. 5, Doc. 11-5, PageID 673. When enrollment materials are silent and the SPD was only updated after the fact, it confirms Ms. Williams' core claim: for years, Bally's failed to provide a compliant wellness program and failed to disclose the availability of a reasonable alternative standard, as required. A single, generalized paragraph buried in an outdated SPD does not cure that failure. The question is not whether some form language was included somewhere in an SPD, but whether *in practice*, **all** the materials provided to participants conveyed a clear and actionable path to avoiding the surcharge. Bally's fails that test.

Bally's fallback argument is that its Benefits Guides are exempt from the notice requirements because they do not describe the "terms" of the wellness program. But this is directly contradicted by the Final Regulations, which make clear that any plan material referencing a tobacco surcharge, or any premium differential tied to a health factor, must include the required disclosures. *See* Final Regulations, 33166 ("a plan disclosure that references a premium differential based on tobacco use . . . is a disclosure describing the terms of a health-contingent wellness program and, therefore, ***must include this disclosure***." (emphasis added)). The Benefits Guides plainly references the "Tobacco Surcharge," triggering the duty to disclose both the availability of an alternative standard and the accommodation of physician recommendations.

The Final Regulations do not allow employers to highlight a surcharge while concealing the legal mechanism to avoid it. If a participant is told she must pay more due to a health factor,

she must also be told, clearly and contemporaneously, how to avoid that outcome. Bally's failure to do so here violates both the spirit and the letter of ERISA's nondiscrimination and disclosure rules.

### D. Ms. Williams Alleges a Cognizable Violation of the "Full Reward" Requirement

#### 1. Bally's Own Plan Materials Confirm the Violation

Bally's attempts to brush aside Ms. Williams' "full reward" claim as conclusory and unsupported (*see* Def. Br., 22), but that contention collapses under the weight of Bally's own written materials. The documents Bally's actually provides to participants (i.e., the Benefits Guides) do not inform them of any right to retroactive reimbursement. Instead, they repeatedly suggest that the tobacco surcharge is eliminated only prospectively, which is fundamentally incompatible with ERISA's "full reward" requirement. *See* 29 C.F.R. § 2590.702(f)(4) and 45 C.F.R. 146.121(f)(4).

That full reward rule could not be clearer: when a participant completes a reasonable alternative standard, they must receive the *entire reward*, not merely future reductions in cost, but a full reimbursement of the amounts previously paid during the Plan year. Yet, Bally's 2023 and 2024 Benefits Guides offered only this: "***[u]pon completion*** of the applicable program, employees can submit their certificate of achievement to Human Resources in order to have the tobacco surcharge eliminated." FAC, ¶¶ 32–34 (emphasis added); *see* PageID 250 and PageID 278 (both containing the disclosure that "[u]pon completion" participants can have the surcharge removed). The unmistakable implication is that the surcharge stops going forward, but surcharges already paid are forfeited. That is precisely what the "full reward" rule prohibits.

Bally's makes the unsupported assertion that it *does* offer retroactive reimbursement (Def. Br., 24), yet, simultaneously insists that it is *not required* to do so. *See* Def. Br. 24–28. That

22

contradiction highlights precisely why dismissal is premature. If retroactive reimbursement is not required by law, as Bally's claims, then there is nothing preventing it from changing course at any time. And if the right to reimbursement is not clearly disclosed in the materials participants actually receive, then the program fails to provide the "full reward" required by law. More importantly, Bally's conflicting statements create a factual dispute that cannot be resolved at the Rule 12(b)(6) stage. *NGM Ins. Co. v. Lorenzo*, No. CA 11-292 S, 2012 U.S. Dist. LEXIS 81034, at *7-8 (D.R.I. Feb. 24, 2012) ("Factual disputes are not resolved in the context of a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6)").

Ms. Williams alleges that the surcharge was imposed prospectively and never reimbursed. FAC, ¶ 32. The documents Bally's produced (i.e., the 2023 and 2024 Benefits Guides) support that allegation, and Bally's has not provided any documents showing it reimbursed surcharges during those Plan years. Whether Bally's *in practice* retroactively reimburses participants or just started doing so in 2025, and whether it consistently communicates that right in participant-facing documents, are factual questions that fall outside the scope of a motion to dismiss. At this stage, Ms. Williams' plausible allegation that Bally's failed to provide the full reward is sufficient to proceed.

### 2.  Bally's Misstates the Law and the Burden

Bally's argument that Ms. Williams must affirmatively plead its noncompliance with every prong of the Final Regulations (Def. Br., 23) reflects a fundamental misunderstanding of both ERISA and controlling Supreme Court precedent. Specifically, *Cunningham v. Cornell Univ.*, 145 S. Ct. 1020 (2025), squarely forecloses Bally's attempt to shift the pleading burden to Ms. Williams. In *Cunningham*, the Court addressed a closely analogous issue: whether plaintiffs asserting a prohibited transaction claim under ERISA must plead facts negating the applicability

of an exemption. The Court answered unequivocally: *they do not*. *See Cunningham*, 221 L. Ed. 2d at 602. Plaintiffs are only required to plead the statutory elements of their claim; the burden of proving any exemption or exception lies squarely with the defendant. *Id.*, 603 ("the burden of persuasion as to certain elements of a plaintiff 's claim may be shifted to defendants, when such elements can fairly be characterized as affirmative defenses or *exemptions*." (citing S*chaffer* v. *Weast*, 546 U. S. 49, 57 (2005))). That principle applies with full force here.

Ms. Williams alleges that Bally's imposed a tobacco surcharge (i.e., a premium differential based on a health factor), which is presumptively unlawful under 29 U.S.C. § 1182(b)(1) and 42 U.S.C. § 300gg-4(b)(1), which prohibit group health plans from varying premiums based on health status. The only way such differentials can survive is if the employer satisfies the strict conditions of the statutory carveout in §§ 1182(b)(2)(B) and 300gg-4(b)(2)(B), permitting such differentials **only** in connection with a qualifying wellness program. Both the structure of the statute (a general prohibition followed by a narrow exception for "programs of health promotion") and the preamble to the Final Regulations[13] make clear that discriminatory surcharges are exceptions to the general rule. Bally's attempt to flip the burden by requiring Ms. Williams to negate each element of that exemption in her pleadings runs headfirst into *Cunningham*. The Court explained that "it would make little sense to put the onus on plaintiffs to plead and disprove any potentially relevant separate . . . exemptions. . . . That would be especially illogical here, where several of the . . . exemptions turn on facts one would expect to be in the fiduciary's possession." *Id.*, 603–04.

---

[13] *See* FAC, ¶ 22 (citing Final Regulations, 33163, asserting that "these rules set forth criteria for an affirmative defense that can be used by plans and issuers in response to a claim that the plan or issuer discriminated" against participants.).

Bally's effort to distinguish *Cunningham* on the ground that § 300gg-4(b)(2)(B) is "not an exception to the discrimination prohibitions" (Def. Br., 23) is not just unpersuasive, it is legally incorrect. The Supreme Court in *Cunningham*, relying on *Meacham v. Knolls Atomic Power Lab.*, 554 U.S. 84 (2008), confirmed that statutory structure, not semantic labels, controls the allocation of burdens. "[W]hen a proviso . . . carves an exception out of the body of a statute or contract those who set up such exception must prove it." *Meacham*, 554 U.S. at 91. Bally's cannot rewrite the statute to flip the burden of proof or dodge the Final Regulations by pretending they are merely interpretive preferences. *See* Def. Br., 23–24. They are binding rules promulgated under delegated authority to administer a statutory exception. Because Bally's seeks the protection of that exception, it must prove it meets all the conditions, including full reward availability, proper notice, and a meaningful alternative standard. See 29 C.F.R. § 2590.702(f).

Moreover, Bally's attempt to sidestep the Departments'[14] interpretation of the statutory structure as irrelevant (Def. Br., 23–24) mischaracterizes both the statute and the role of the agencies tasked with enforcing it. The Departments are not inventing an affirmative defense out of whole cloth; they are interpreting and operationalizing the narrow statutory exception that Congress created. Congress, through ERISA and PHSA § 2705(b)(2)(B), authorized outcome-based wellness programs as an exception to the general rule barring discriminatory surcharges based on health status. The Departments—acting under their delegated authority[15]—were tasked with defining what qualifies as a compliant "program[] of health promotion or disease prevention." *See* 29 U.S.C. § 1182(b)(2)(B). That is exactly what the Final Regulations do. They prescribe the conditions that must be met for an employer to impose a health-based premium differential,

---

[14] DOL, Department of Health and Human Services, and Department of Treasury.

[15] *See supra*, n.2.

including requirements that the plan offer a reasonable alternative standard, provide proper notice, and make the *full reward* available. *See* 29 C.F.R. § 2590.702(f)(4).[16]

Ms. Williams has done all that is required at the pleading stage. She alleges that Bally's imposed a higher premium based on nicotine use and failed to offer a compliant program that made the full reward available to all qualifying participants and notified them of all avenues to avoid the surcharge. That suffices. Whether Bally's can ultimately prove that its program met the stringent requirements of § 300gg-4(b)(2)(B) and its implementing regulations is a merits issue. It certainly is not an issues the Court can resolve on a motion to dismiss.

### 3. The Statute, Regulations, and Case Law All Confirm That the "Full Reward" Must Be Retroactive

Bally's argument that ERISA and the PHSA do not require retroactive reimbursement and that Ms. Williams' claims are based solely on a regulatory preamble (Def. Br., 24–25) conflicts with the legislative history, regulatory text, agency guidance, and growing judicial consensus that the "full reward" must be made available retroactively. Ms. Williams' claims are rooted in statutory text, specifically, Congress's directive in PHSA § 2705 that the "*full* reward . . . shall be made available to all similarly situated individuals." 42 U.S.C. § 300gg-4(j)(3)(D) (emphasis added). That phrase—"full reward"—originated not with the agencies, but with Congress itself.

When Congress passed § 2705 as part of the Affordable Care Act in 2010, it tracked much of the language from the 2006 wellness program regulations but added one key word that was not

---

[16] The language of the Final Regulations governing outcome-based programs leaves no room for discretion or partial compliance. It states unequivocally that "[a] health-contingent wellness program that is an outcome-based wellness program . . . does ***not*** violate the provisions of this section ***only if all of the following requirements are satisfied***." 29 C.F.R. § 2590.702(f)(4) (emphases added). Phrasing it this way puts employers on notice of a strict compliance standard: Unless a plan satisfies *every* listed requirement—such as providing the full reward, issuing appropriate notice, and offering a reasonable alternative standard—they cannot impose a premium differential based on health status. Anything less fails the test.

previously used: *full*. *See* 71 Fed. Reg. 75014 (Dec. 13, 2006) ("2006 Regulations") (using the word "reward" repeatedly, but never "full reward"). Congress's addition of the term "full" in 2010 demonstrates a clear intent to strengthen participant protections and ensure that any reward for meeting a reasonable alternative standard must be made whole.[17] And rather than contradict or deviate from that statutory goal, the Departments' Final Regulations simply implemented and clarified Congress's command.

The Departments have repeatedly confirmed the meaning of "full reward." In the preamble to the Final Regulations,[18] the Departments make clear that if a participant satisfies the alternative standard, at any point during the plan year, they must receive the exact same benefit as someone who never used nicotine. This is not agency invention; it is statutory implementation. The

---

[17] Notably, the Secretary of Labor has argued that "the addition of the word 'full' was a mere clarification of the earlier regulation[,]" and that the requirement to provide the entire years' worth of surcharges to any participant who satisfies the alternative standard existed even before the adoption of the Final Regulations in 2014. *See Sec'y of Labor v. Macy's, Inc*., No. 1:17-cv-541, 2021 U.S. Dist. LEXIS 221603, at *51 (S.D. Ohio Nov. 17, 2021). In *Macy's*, even the defendant agreed that the requirement to provide retroactive reimbursement applied to plans in operation in 2014 and after. *Id.*, *50 ("***all seem to agree that the later version of the regulation would require a refund of the entire annual amount for anyone who completes the reasonable alternative standard at any point during the year***.").

[18] Bally's attempts to downplay the Departments' interpretation of the Final Regulations by referring to it as merely a "statement in the preamble[.]" Def. Br., 24. But courts routinely consider preambles when construing agency regulations, especially where they provide context or clarification. *See Halo v. Yale Health Plan*, 819 F.3d 42, 52–53 (2nd Cir. 2016) ("'it does not make sense to interpret the text of a regulation independently from its' preamble" (citation omitted); *Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 158 n.13 (1982) ("we look to the preamble . . . for the administrative construction of the regulation, to which 'deference is . . . clearly in order.'") (cleaned up); *Walker v. Azar*, 480 F. Supp. 3d 417, 429 (E.D.N.Y. 2020) ("regulations must have a preamble . . . And '[w]hile language in the preamble of a regulation is not controlling over the regulation itself, we have often recognized that the preamble to a regulation is evidence of an agency's contemporaneous understanding of its proposed rules.'" (citations omitted)).

Departments even provided concrete examples demonstrating how retroactive refunds must work in practice to avoid impermissible discrimination.[19]

Bally's argument that this interpretation is mere "parroting" (*see* Def. Br., 25) ignores how administrative law actually works. Where an agency interprets its own regulation, *Auer v. Robbins*, 519 U.S. 452 (1997), provides that courts must defer to that interpretation unless it is "plainly erroneous or inconsistent with the regulation." This case is a textbook example of valid *Auer* deference. The Departments—who spent over two decades developing and refining these substantive and binding regulations—promulgated the Final Regulations after robust notice-and-comment procedures and with congressional review. *See* Final Regulations, 33158–60. Their interpretation of "full reward" reflects both statutory fidelity and regulatory expertise, and is entitled to deference.

The DOL's enforcement action, in *Secretary of Labor v. Macy's, Inc.*, No. 1:17-cv-541 (S.D. Ohio), further confirms this interpretation. The DOL successfully argued that ERISA requires retroactive reimbursement of all surcharges in a plan year to participants who complete a tobacco cessation program, not merely prospective relief, asserting:

> "The 'reward' at issue is the ***avoidance of all monthly surcharges in a given Plan year*** because this was the incentive given by Macy's to non-tobacco users. Therefore, in order for the reward to be available to all similarly situated individuals, the ***plain language of the regulations***

---

[19] *See* FAC, ¶ 28 (citing the Final Regulations, 33163 "While an individual may take some time to request, establish, and satisfy a reasonable alternative standard, ***the same, full reward must be provided to that individual as is provided to individuals who meet the initial standard for that plan year***. (For example, if a calendar year plan offers a . . . premium discount and an individual . . . satisfies that alternative on April 1, the plan or issuer must provide the premium discounts for January, February, and March to that individual.) Plans and issuers have flexibility to determine ***how*** to provide the portion of the reward corresponding to the period before an alternative was satisfied (e.g., payment for the retroactive period or pro rata over the remainder of the year) ***as long as . . . the individual receives the full amount of the reward***[.]" (emphases added)).

> ***required reimbursement*** of the Tobacco Surcharge ***for the entire Plan year*** to Plan participants who completed a tobacco cessation program."

*Macy's*, Memo in Opp. to Defendant's Motion to Dismiss, ECF 41, PageID 360–61 (emphases added). The DOL reaffirmed this position in January 2025, explaining:

> That the 2013 regulation clarified this understanding by adding the term "full reward" does not change the plain meaning of the language in the 2006 regulation . . . ERISA section 702(b) compels this interpretation—it prohibits discrimination based on a health status factor, and Macy's argument would in fact allow for plans to discriminate for a portion of the plan year."

Macy's, Memo in Opposition to Defendants' Motion for Reconsideration, ECF 87, PageID: 1224 (Jan. 24, 2025). Every court to consider this issue has reached the same conclusion.

Notably, every court to consider this issue has sided with the Department's interpretation and found that plans must provide retroactive reimbursement where participants complete a reasonable alternative standard. *See Bokma v. Performance Food Grp., Inc.*, No. 3:24-cv-686, 2025 U.S. Dist. LEXIS 99234 (E.D. Va. May 20, 2025);[20] *Mehlberg v. Compass Grp. USA, Inc*., No. 24-cv-04179, 2025 U.S. Dist. LEXIS 84589 (W.D. Mo. Apr. 15, 2025); *Lipari-Williams v. Missouri Gaming Company*, 339 F.R.D. 515 (W.D. Mo. 2021). These decisions uniformly recognize that where a plan fails to provide retroactive refunds, or fails to notify participants of their right to the full reward, it violates ERISA's wellness program requirements.

---

[20] Bally's effort to sidestep *Bokma* is unconvincing. Def. Br., 26 n. 16; *id*, 28 n.17. *Bokma* squarely addressed materially identical allegations that an employer violated ERISA by failing to provide the *full reward* to participants who satisfied a reasonable alternative standard under a tobacco surcharge wellness program. The court upheld the claim under the very same statutory and regulatory framework at issue here. *See Bokma*, 2025 U.S. Dist. LEXIS 99234, *27, *35–36, *42–43. *Bokma* is not distinguishable; it is a roadmap.

### 4. *Loper Bright* Does Not Authorize Courts to Disregard the Final Regulations or Rewrite the Wellness Program Framework

Bally's reliance on *Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024), is both premature and misplaced. While *Loper Bright* overruled *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984), requiring courts to defer to an agency's interpretation of ambiguous statutory text, it did ***not*** authorize courts to ignore regulations that were properly promulgated through formal notice-and-comment rulemaking. The wellness program regulations at issue here are longstanding, formal rules issued under express statutory authority, following robust rulemaking procedures.[21] Nothing in *Loper Bright* gives Bally's permission to ignore the rules. They are binding law unless and until challenged and invalidated in a direct attack.[22]

Indeed, the DOL squarely addressed this issue post-*Loper Bright*, noting that "*Loper Bright* did not broadly drain from all regulations overnight the force of law, or otherwise permit courts to disregard a duly promulgated regulation outside of a challenge to the regulation itself." *See Macy's*, No. 1:17-cv-541, Supplemental Brief on *Loper Bright v. Raimondo*, ECF 77, PageID 912. Courts have already rejected Bally's extreme interpretation. In *Hansen v. Lab'y Corp. of Am.*, No. 24-

---

[21] *See Loper Bright,* 603 U.S. at 394–95 ("In a case involving an agency, of course, the statute's meaning may well be that the agency is authorized to exercise a degree of discretion. Congress has often enacted such statutes. For example, some statutes 'expressly delegate[ ]' to an agency the authority to give meaning to a particular statutory term. Others empower an agency to prescribe rules to 'fill up the details' of a statutory scheme.").

[22] *See Macy's*, ECF 77, PageID 912 ("The Secretary's [Final R]egulations implementing ERISA section 702(b) are legislative rules promulgated pursuant to statutorily delegated authority and notice-and-comment procedures, and thus ***have the force and effect of law***. 29 U.S.C. § 1135 . . . . [citing] *Perez v. Mortgage Bankers Ass'n*, 575 U.S. 92, 96 (2015) ('Rules issued through the notice-and-comment process are often referred to as 'legislative rules' because they have the 'force and effect of law.'" (emphasis added)); *see also La Casa Del Convaleciente v. Sullivan*, 965 F.2d 1175, 1178 (1st Cir. 1992) ("A substantive rule has the force of law, while an interpretive rule is merely a clarification or explanation of an existing statute or rule and is issued by an agency to advise the public of the agency's construction of the statutes and rules which it administers.").

CV-807, 2024 U.S. Dist. LEXIS 193350, at *16 (E.D. Wis. Oct. 24, 2024), the court clarified that "*Loper* does not stand for the proposition that all regulations promulgated by federal agencies must be disregarded." The *Loper Bright* decision simply reaffirms that courts must interpret statutes independently, but regulations validly issued under statutory authority remain binding and enforceable unless invalidated through proper legal challenge.

That principle has already been applied in the context of wellness program litigation. In *Bokma v. Performance Food Grp., Inc.*, No. 3:24-cv-686, 2025 U.S. Dist. LEXIS 99234 (E.D. Va. May 20, 2025), and *Mehlberg v. Compass Grp. USA, Inc.*, No. 24-cv-04179, 2025 U.S. Dist. LEXIS 84589 (W.D. Mo. Apr. 15, 2025), the courts expressly considered *Loper Bright* and reaffirmed the continued force of the Departments' regulatory interpretation of the "full reward" requirement. In both cases, the courts credited the Departments' explanation that plans must provide retroactive reimbursement in order to satisfy ERISA's nondiscrimination requirements. *See Bokma*, 2025 U.S. Dist. LEXIS 99234, *22–25 and *46–47.

*Loper Bright* does not give Bally's a blank check to rewrite the wellness program rules. Courts remain fully empowered to enforce valid regulations, especially where, as here, they reflect deep agency expertise and a careful balance of policy considerations that Congress delegated to the Departments. Bally's cannot sidestep those rules simply because they find them inconvenient.

### E.  Ms. Williams States a Claim for Fiduciary Breach

Bally's paints Ms. Williams' fiduciary breach allegations as a mere "parasitic" add-on to her statutory claim. *See* Def. Br., 29 n.18. But Ms. Williams does not simply allege that Bally's violated a statutory wellness program rule. She alleges that Bally's, acting as a functional fiduciary, misused plan assets and administered a discriminatory surcharge regime in a manner that violated ERISA's core fiduciary obligations, independent of the statutory framework.

Unlike a pure statutory violation, the fiduciary claim focuses on how Bally's *administered* the wellness program over time, exercising discretion, making ongoing administrative decisions, and failing to monitor or update the program's terms. Per the Complaint, Bally's maintained the surcharge structure for years, failed to reimburse participants, failed to review the terms of the wellness program to ensure compliance with the rules, retained control over whether and when reimbursements were issued, and drafted participant-facing materials that lacked required disclosures. *See* FAC, ¶¶ 34–42. These are classic fiduciary acts, precisely the sort of conduct that gives rise to liability under 29 U.S.C. § 1104(a).

Moreover, Ms. Williams alleges that Bally's structured and administered the surcharge in a way that benefited itself financially at the expense of participants. Rather than allocating surcharge revenue for the exclusive benefit of the Plan or its beneficiaries, as ERISA demands, Bally's retained the funds, thereby reducing its own healthcare costs and earning interest on those funds. FAC, ¶ 67. This cost-shifting arrangement, implemented under the guise of health promotion, violated ERISA's fiduciary duties of loyalty and prudence. *See* 29 U.S.C. § 1104(a)(1); *Grodotzke v. Seaford Ave. Corp.*, 17 F. Supp. 3d 185, 193 (E.D.N.Y. 2014) ("[Defendants] breached their duties by commingling plan assets with company assets and using those monies to pay their creditors instead of forwarding the plan assets to the Funds.").

### 1.  Count II Challenges Fiduciary Conduct, Not Settlor Decisions

Bally's argues that its surcharge and wellness program design choices are immune under the "settlor function" doctrine. *See* Def. Br., 29–30. But Ms. Williams does not challenge Bally's right to adopt plan terms or establish contribution rates in its settlor capacity. Rather, she challenges Bally's *implementation and ongoing administration* of those terms, functions ERISA treats as fiduciary in nature.

Courts have long drawn a clear distinction between settlor functions (e.g., deciding whether to include a wellness program) and fiduciary functions (e.g., managing how that program is communicated, administered, and enforced). *See Massaro v. Palladino*, 19 F.4th 197, 211-12 (2d Cir. 2021) ("'trustee[s] under ERISA . . . wear different hats,' but ERISA requires 'that the fiduciary with two hats wear only one at a time, and wear the fiduciary hat when making fiduciary decisions.'" (citing *Pegram v. Herdrich*, 530 U.S. 211, 226 (2000))). Bally's conduct falls squarely on the fiduciary side of the line: it operated the program, decided what communications to provide participants, and exercised discretion over whether participants received surcharge reimbursements.

Bally's reliance on *Lockheed Corp. v. Spink*, 517 U.S. 882 (1996), and *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432 (1999), is inapposite. Those cases confirm only that adopting or amending a plan is a settlor function. But Ms. Williams' claim does not rest on the fact that Bally's adopted a flawed plan. It rests on how Bally's *administered* that plan, in a way that prioritized its own financial interests, failed to provide participants with required notices and rights,[23] and misused participant contributions. *See* FAC, ¶¶ 34–42.

Additionally, Ms. Williams' claim is not that ERISA requires Bally's to maximize pecuniary benefits or guarantee contribution levels. Def. Br., 30. Instead, her claim is that Bally's used a noncompliant wellness program as a subterfuge to reduce its own financial burden. Ms. Williams is not required, at the pleading stage, to prove Bally's acted with an "impermissible

---

[23] *See In re Dell Inc.*, 563 F. Supp. 2d 681, 694–95 (W.D. Tex. 2008) (recognizing that failing to "provide complete and accurate information to participants[,]" about their rights under a plan supported a viable ERISA claim); *Johnson v. Pluralsight, LLC*, 728 F. App'x 674, 676 (9th Cir. 2018) (holding failure to disclose cancellation policies before charging a customer constituted a concrete injury).

motive." Def. Br., 31. Rather, she need only allege facts supporting a plausible inference that Bally's was acting in its own interest rather than solely in the interest of plan participants. The FAC does just that by alleging that the surcharge disproportionately shifted Plan costs to employees under a wellness regime that failed to offer an alternative standard making available the "full reward" and failed to notify participants of their rights to avoid the surcharges. FAC, ¶¶ 63–71.

### 2. Ms. Williams Alleges a Prohibited Transaction Involving Plan Assets and Fiduciary Self-Dealing

Bally's argues that Ms. Williams' prohibited transaction claim fails because it merely repackages her loyalty claim, does not involve a "transaction" under ERISA, and reflects permissible cost-sharing under the Plan. Each argument misses the mark. Def. Br., 32–33.

Ms. Williams alleges a distinct and independently actionable violation of ERISA §§ 406(a)(1)(D) and 406(b)(1). ERISA § 1106(a)(1) bars fiduciaries from causing the Plan to engage in certain transactions with a "party in interest," and § 1106(b)(1) prohibits fiduciaries from dealing with Plan assets in their own interest. Each time Bally's collected tobacco surcharges under a noncompliant wellness program and used those contributions to offset its own financial obligations, it engaged in a textbook prohibited transaction. As the Third Circuit has explained, "[t]he elements of a party-in-interest, prohibited transaction claim are: (1) the fiduciary causes (2) a listed transaction to occur (3) between the plan and a party in interest." *Sweda v. Univ. of Pa.*, 923 F.3d 320, 335 (3d Cir. 2019), *cert. denied*, 140 S. Ct. 2565 (2020). Ms. Williams satisfies each element. She alleges that Bally's acted as a fiduciary when administering its wellness program, implemented a discriminatory surcharge without ensuring compliance with applicable regulations, and used participant contributions to reduce the company's own health care costs. *See* FAC ¶¶ 41–

34

42, 67–70. These allegations describe more than internal cost-sharing, they describe fiduciary self-dealing with plan assets in direct violation of ERISA § 1106(b)(1).

Bally's claims that there was no "transaction" and no misuse of "plan assets," but that argument elides the reality of how the surcharge operated. Each collection of participant funds constituted a fiduciary act, and when Bally's diverted those funds for its own benefit, without satisfying the regulatory safe harbor, it engaged in a self-interested transaction. That is exactly the type of conduct ERISA forbids.[24]

Also, Defendant's reliance on *Hutchins v. HP Inc.*, No. 5:23-cv-06091, 2025 U.S. Dist. Lexis 21095, (N.D. Cal. Feb. 5, 2025), is misplaced. *Hutchins* involved a defined contribution plan and a dispute over how forfeited employer matching contributions were allocated *within* the confines of an otherwise compliant plan. *See id.*, *2–4. *Hutchins* had nothing to do with wellness programs, surcharges, or fiduciary self-dealing. Here, by contrast, Ms. Williams alleges that Bally's, while acting as a fiduciary, administered a tobacco surcharge without making available a compliant wellness program and used the money from that surcharge to offset its own costs associated with the Plan.[25] This is not a quarrel about marginal benefit allocation among

---

[24] *See Pipefitters Local 636 Ins. Fund v. Blue Cross & Blue Shield of Mich.*, 722 F.3d 861, 868 (6th Cir. 2013) (holding that a fiduciary breaches its ERISA duties when it exercises discretion over plan assets in a way that benefits itself rather than plan participants, including by commingling funds or diverting them to reduce its own financial obligations because "ERISA [] contains an 'absolute bar against self dealing'"); *see also Sweda*, 923 F.3d at 336–37 (3d Cir. 2019) (discussing self-dealing and how "[t]he instances where participants might benefit from a transaction between a plan and a fiduciary are so rare that they can be prohibited outright."); *UFCW Local 56 Health & Welfare Fund v. Brandywine Operating P'ship, Ltd. P'ship*, No. 05-cv-2435, 2005 U.S. Dist. LEXIS 25759, at *8 (D.N.J. Oct. 28, 2005) ("In particular, the prohibited transaction rules seek to prevent 'self-dealing' and 'sweetheart deals' that carry a high risk of 'corruption and loss of plan assets'") (citation omitted)).

[25] *See* ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1)(D) ("a fiduciary shall discharge his duties . . . "in accordance with the documents and instruments governing the plan *insofar as such documents*

participants; it is a claim that Bally's used participant contributions as an off-books employer subsidy.

Bally's final argument—that a prohibited transaction claim fails absent allegations of plan underfunding—is flatly wrong. Def. Br., 33. ERISA does not condition liability under § 1106(b)(1) on a showing of actual financial harm or underfunding. *See In re Textron, Inc. ERISA Litig.*, 2011 U.S. Dist. LEXIS 100209, *14–15. While *Spink* references "commercial bargains that present a special risk of underfunding," (517 U.S. at 893), that language does not limit the statute's scope. It merely highlights the rationale for ERISA's prophylactic rules. The plain text of § 1106(b)(1) imposes a flat ban: a fiduciary "shall not . . . deal with the assets of the plan in his own interest or for his own account." That is exactly what Ms. Williams alleges Bally's did. It used participant contributions collected under a discriminatory, noncompliant scheme to defray its own health plan expenses.

### 3. Bally's Breached Its Duty to Monitor Plan Compliance

This Court should reject Bally's contention that Ms. Williams' failure-to-monitor claim must be dismissed as "derivative" of an underlying fiduciary breach. The duty to monitor is an independent and well-established fiduciary obligation under ERISA, one that exists to ensure that plan operations remain compliant over time and that any breaches are identified and remedied. *See Hughes v. Nw. Univ.*, 595 U.S. 170, 175-76, 142 S. Ct. 737, 741 (2022) (explaining that fiduciaries have a "continuing duty to monitor [which] is a subset of the duty of prudence") (citing *Tibble v.*

---

*and instruments are consistent with*" ERISA); *see also Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 420 (2014) (holding that ERISA "makes clear that the duty of prudence trumps the instructions of a plan document"); *In re Textron, Inc. ERISA Litig.*, No. 09-cv-00383, 2011 U.S. Dist. LEXIS 100209, at *23 (D.R.I. Sep. 6, 2011) ("Multiple courts have . . . found that the fiduciary duties spelled out in ERISA trump requirements in investment plan documents. *See In re Morgan Stanley ERISA Litig.*, 696 F.Supp.2d 345, 358 (S.D.N.Y. 2009)").

*Edison Int'l*, 575 U.S. 523, 530 (2015) (reiterating fiduciaries' "continuing duty to monitor" and ensure compliance with ERISA's requirements)).

Bally's years-long failure to actively review and update the terms of the wellness program, which continued until Bally's finally revised its program in 2025—after lawsuits of this type proliferated—is not a discretionary "settlor" decision about whether or not to adopt or amend a plan. It is a fiduciary administrative function involving the ongoing monitoring of the Plan's compliance with federal law. Bally's shirked that obligation. It cannot hide behind its settlor hat while ignoring its fiduciary responsibilities once the program was implemented.

At a minimum, the failure to monitor raises a disputed issue of fact that is not properly resolved at the motion to dismiss stage. *See In re Textron*, 2011 U.S. Dist. LEXIS 100209, *27 (permitting the plaintiff's failure to monitor claim to proceed "because it is a highly fact-specific analysis"). Here, Ms. Williams' claim must proceed because it is grounded in Bally's fiduciary role as overseer of a Plan that was administered in clear violation of ERISA, and it raises fact issues not properly resolved at this stage of the proceedings. *In re Syncor Erisa Litig.*, 351 F. Supp. 2d 970, 986 (C.D. Cal. 2004) ("The scope of the duty to monitor will require a factually intense analysis . . . . The Court declines to determine the scope of the duty at this [motion to dismiss] stage of the litigation.").

### F. Exhaustion of Administrative Remedies Is Not Required for Statutory Claims and Does Not Apply Here

The overwhelming weight of authority holds that exhaustion of administrative remedies is not required when plaintiffs seek to enforce statutory rights under ERISA, rather than challenge a denial of benefits under the plan. The Third, Fourth, Fifth, Sixth, Ninth, Tenth, and D.C. Circuits have all recognized that statutory ERISA claims stand apart from contractual claims for plan

benefits and are not subject to administrative exhaustion requirements.[26] While the First Circuit has not ruled directly on this issue, district courts (as Bally's points out, Def. Br., 36 n.21) within this Circuit have concluded that exhaustion is not required for statutory ERISA claims. *See Guevara Ortiz v. Unión Independiente de Empleados*, 540 F. Supp. 3d 169, 174–75 (D.P.R. 2021) ("this Court holds that exhaustion is not required for statute-based claims, such as the one here."). Only the Eleventh Circuit[27] has taken the rigid position that exhaustion is always required, even for claims grounded in ERISA's statutory protections. *See Lindemann v. Mobil Oil Corp.*, 79 F.3d 647, 649-50 (7th Cir. 1996). This Court should adopt the prevailing view and find that exhaustion is not required for Ms. Williams' statutory ERISA claims because applying the exhaustion doctrine here would serve none of its intended purposes.

The exhaustion requirement is rooted in notions of efficiency and deference to plan administrators' specialized expertise in interpreting plan documents and resolving benefit disputes.

---

[26] *See, e.g.*, *Zipf v. AT&T*, 799 F.2d 889, 891–93 (3d Cir. 1986); *Smith v. Sydnor*, 184 F.3d 356, 362 (4th Cir. 1999); *Galvan v. SBC Pension Benefit Plan*, 204 F. App'x. 335, 338-39 (5th Cir. 2006) (fiduciary breach claim); *Hitchcock v. Cumberland Univ. 403(b) DC Plan*, 851 F.3d 552, 564 (6th Cir. 2017); ; *Spinedex Physical Therapy USA Inc. v. United Healthcare of Ariz., Inc.*, 770 F.3d 1282, 1294 (9th Cir. 2014); *Held v. Mfrs. Hanover Leasing Corp.*, 912 F.2d 1197, 1205 (10th Cir. 1990); *Stephens v. Pension Benefit Guar. Corp.*, 755 F.3d 959, 965, 410 U.S. App. D.C. 317 (D.C. Cir. 2014) (discussing fiduciary breach claims).

[27] The Seventh Circuit, by contrast, has made clear that the exhaustion requirement is left to the discretion of the district court. *See Orr v. Assurant*, 786 F.3d 596, 601 (7th Cir. 2015). Similarly, the Second Circuit has not ruled one way or the other but has acknowledged that district courts in the that circuit have found "dispensed with the exhaustion requirement where plaintiffs allege statutory ERISA violations." *Diamond v. Local 807 LaborManagement Pension Fund*, 595 F. App'x 22, 25 (2d Cir. 2014). Bally's attempt to portray counsel's decision to pursue an administrative claim in another Seventh Circuit case (*Rogers v. Advocate Aurora Health*, 1:24-cv-8664-LAH (N.D. Ill. May 1, 2025) (*see* Def. Br., 37 n.23) as undermining Ms. Williams' position falls short. That strategic choice was driven by prudential and efficiency concerns, not by any concession that exhaustion is legally required for statutory claims. In fact, the plaintiffs in *Rogers* raised the same argument that exhaustion does not apply to statutory claims. *Id.*, Doc., 38, PageID 854–57.

But Ms. Williams is not seeking a correction of benefit calculations or invoking ambiguous plan terms. *See* Def. Br., 36 (asserting her claims are "dress[ed] up [] denial-of-benefits"). She is asserting violations of ERISA's nondiscrimination rules governing wellness programs under 29 U.S.C. § 1182 and the fiduciary duties imposed by 29 U.S.C. § 1104. These are legal obligations imposed by Congress, not rights arising from the plan's internal terms, and their resolution does not turn on plan interpretation but on federal law. Plan administrators are neither equipped nor authorized to adjudicate whether a wellness program complies with PHSA § 2705 or whether a fiduciary breached duties of loyalty and prudence.[28] Further, in this case, exhaustion would not advance the purposes underlying the exhaustion doctrine.[29] There is no risk of a frivolous claim, as the DOL has filed a similar lawsuit challenging a surcharge with no compliant wellness program. *See Macy's*. The issues are purely legal and Bally's internal procedures involve no formal discovery, cross-examination, or fact-finding. There is no record to develop and no reasonable prospect that Bally's would reverse its position. As a result, exhaustion in this context would impose needless delay without promoting deference or administrative efficiency.[30]

---

[28] *Stephens*, 410 U.S. App. D.C. at 32 ("While plan administrators may have particular expertise in interpreting their pension plans' terms, federal judges have particular expertise in interpreting statutory terms. And while consistent application of a pension plan's terms might best be achieved by allowing plan administrators to interpret those terms in the first instance, consistent application of the law is best achieved by encouraging a unitary judicial interpretation of that law. Federal district courts also have the expertise to create a factual record, should that be necessary, and to encourage settlement of disputes where appropriate.").

[29] *See Donaldson v. Pharmacia Pension Plan*, 435 F. Supp. 2d 853, 859–60 (S.D. Ill. 2006)(explaining that the doctrine of exhaustion is meant to "[1] help reduce the number of frivolous lawsuits under ERISA; to [2] promote the consistent treatment of claims for benefits; to [3] provide a non-adversarial method of claims settlement; and [4] to minimize the cost of claims settlement for all concerned").

[30] *See Janowski v. Int'l Bhd. of Teamsters Local No. 710 Pension Fund*, 673 F.2d 931, 935 (7th Cir. 1982) *vacated on other grounds*, 463 U.S. 1222 (1983)(finding "the exhaustion doctrine has been applied in ERISA cases only in situations where an individual has applied for and been denied

Also, Ms. Williams' claims are not disguised benefit claims because she is not alleging that she was denied a benefit "under the Plan." For this reason, Ms. Williams does not bring a claim under ERISA § 502(a)(1)(B); rather, she must bring her claims under § 502(a)(2) and (a)(3). Ms. Williams alleges that Bally's imposed an unlawful surcharge through a program that failed to comply with ERISA's statutory requirements and then misused the resulting funds. Those allegations implicate statutory enforcement, not plan enforcement, and do not require exhaustion.

Even setting aside the circuit split, this Court should decline to require exhaustion for the additional reason that Bally's administrative process does not apply to this type of claim at all. The SPD outlines detailed procedures for "claims for benefits under the Plan." *See* Def. Ex. 2, Doc. 11-2, PageID 510–12. The procedures outlined in the SPD apply exclusively to requests for specific benefits such as medical or dental care and appeals of denied claims for such benefits. There is no provision in the SPD that governs challenges to the legality of the Plan's terms, such as the structure of its tobacco surcharge or the lack of a reasonable alternative standard in its wellness program. Again, there is no dispute that Bally's applied the wellness program exactly as the Plan required. Ms. Williams does not contend that she was improperly denied participation in the program or that she failed to receive a benefit she was entitled to under the Plan. Rather, she asserts that the very structure of the surcharge, and the administration of the wellness program, violate ERISA's anti-discrimination rules. That is not a contractual claim "under the Plan," but a

---

current benefits. In contrast, this case concerns clarification of the right of an entire class to future benefits. This issue is solely a question of statutory interpretation and does not require a factual record"); *see also Fallick v. Nationwide Mutual Ins. Co.*, 162 F.3d 410, 420 (6th Cir. 1998) (finding "[t]he law does not require parties to engage in meaningless acts or to needlessly squander resources as a prerequisite to commencing litigation").

statutory claim under 29 U.S.C. § 1182 and 42 U.S.C. § 300gg-4. Only a court, not a claims administrator, is trained and competent to adjudicate that.

In sum, Ms. Williams' fiduciary breach claims go far beyond a challenge to contribution levels or the collection of participant surcharges. She alleges that Bally's, acting in a fiduciary capacity, administered a wellness program that was unlawful because it fails to make available the "full reward" as required and, year after year, it failed to properly communicate to participants the available avenues to avoid the surcharge, as required. Bally's also failed to monitor or update the terms of the wellness program and used the money from the surcharges to offload corporate costs onto participants while retaining the financial upside. That conduct squarely implicates ERISA's core fiduciary duties of loyalty and prudence, and triggers statutory prohibitions on self-dealing transactions involving plan assets. This is not simply a settlor dispute over plan design. It is an action to hold a Plan fiduciary accountable for implementing and perpetuating a program that violated federal law while profiting at the expense of its participants. The motion to dismiss these claims should be denied.

## IV.    CONCLUSION

For the foregoing reasons, Defendant's motion to dismiss should be denied in its entirety.

Dated:   June 30, 2025,                         Respectfully submitted,


**SIRI & GLIMSTAD LLP**

*/s/ Oren Faircloth*
Oren Faircloth (*pro hac vice*)
Kimberly Dodson (*pro hac vice*)
745 Fifth Avenue, Suite 500
New York, New York 10151
Tel: (212) 532-1091
E: ofaircloth@sirillp.com
E: kdodson@sirillp.com

Mark B. Morse
RI Bar Reg No 3003
420 Angell Street
Providence, RI 02906
(401) 831-0555
Fax (401) 273-0937
mark@morselawoffice.com

*Attorneys for Plaintiff and the Proposed Class*